PEOPLE v THENGHKAM

Docket No. 207303. Submitted September 14, 1999, at Detroit. Decided
    February 29, 2000, at 9:10 A.M.

Lamphone Thenghkam, a minor, pleaded guilty in 1994 when charged
    as an adult in the Detroit Recorder's Court with second-degree
    murder and possession of a firearm during the commission of a fel-
    ony. As permitted by MCL 769.1; MSA 28.1072 before its amend-
    ment in 1996, the court, Dalton A. Roberson, J., exercised its dis-
    cretion to sentence the defendant as a juvenile after considering
    the criteria set by MCR 6.931(E)(3) and MCL 769.1(3); MSA
    28.1072(3) for determining whether to sentence a minor as an adult
    or as a juvenile. The prosecution appealed, and the Court of
    Appeals, YOUNG, P.J., and TAYLOR and R. C. LIVO, JJ., in an unpub-
    lished opinion per curiam, issued June 13, 1997 (Docket No.
    182588), reversed and remanded for reconsideration whether the
    defendant should be sentenced as an adult or as a juvenile. On
    remand, the trial court again sentenced the defendant as a juvenile.
    The prosecution appealed.

The Court of Appeals *held*:

1. A bifurcated procedure is employed in reviewing a trial court's
    decision to sentence a minor as a juvenile or as an adult. First, the
    trial court's factual findings supporting its determination regarding
    each statutory factor is reviewed for clear error. Second, the ulti-
    mate decision whether to sentence the minor as a juvenile or as an
    adult is reviewed for abuse of discretion.

2. The first of the six statutory factors the trial court had to con-
    sider concerned the defendant's prior record and character, physi-
    cal and mental maturity, and pattern of living. With respect to prior
    record and character, the trial court clearly erred because it made
    no findings regarding character and its statements concerning prior
    record served to defend or excuse the defendant's criminal con-
    duct. With respect to physical and mental maturity, the trial court
    clearly erred because the findings it made related to smallness of
    stature and social immaturity, which are different from physical
    and mental maturity. With respect to pattern of living, the trial
    court did not clearly err in finding that the defendant had a chaotic
    life.

3. The second of the six statutory factors the trial court had to consider concerned the seriousness and circumstances of the offense. The trial court's statements regarding this factor did not amount to findings of fact that show how or why the circumstances of the offense made it more or less serious.

4. The third of the six statutory factors the trial court had to consider concerned whether the offense was part of a repetitive pattern of offenses that would lead to the determination that the juvenile was not amenable to treatment or that, despite the juvenile's potential for treatment, owing to the nature of the delinquent behavior, the juvenile was likely to disrupt the rehabilitation of others in the treatment program. The trial court clearly erred with respect to this factor because it made no findings concerning this factor on remand.

5. The fourth of the six statutory factors the trial court had to consider concerned the defendant's potential to be dangerous to the public when released at age twenty-one. The trial court clearly erred in finding that the defendant would not pose a danger if released at age twenty-one because that finding was based on the opinion of witnesses who predicated their opinions on the defendant's ability to receive treatment, yet the trial court failed to find that the defendant was amenable to treatment, and because the trial court failed to consider whether, given the juvenile's delinquent behavior, he would pose a danger when released.

6. The fifth of the six statutory factors the trial court had to consider concerned whether the defendant was more likely to be rehabilitated by the services and facilities available in the adult programs and proceedures than in the juvenile programs and proceedures. The trial court clearly erred with respect to this factor because it failed to make findings with respect to which system, adult or juvenile, was best for accomplishing rehabilitation.

7. The last of the six statutory factors the trial court had to consider concerned what was in the best interests of the public welfare and the protection of the public security. The trial court clearly erred with respect to this factor because it failed to make a specific finding concerning public welfare and security and instead recapitulated its findings regarding the other factors.

8. The trial court abused its discretion in choosing to sentence the defendant as a juvenile. The trial court did not give equal weight to the statutory factors when it gave positive factors ample consideration and negative factors short shrift or no consideration.

9. Constitutional protections against double jeopardy do not bar a resentencing of the defendant, who has now been discharged

from the juvenile system upon reaching age twenty-one, because the defendant's sentence was invalid.

10. Vacating the sentence and resentencing the defendant after discharge from the juvenile system will not violate the defendant's right to due process.

11. This case must be remanded for a resentencing before a different judge, who must make independent findings of fact with respect to the statutory factors for determining whether the defendant should be sentenced as a juvenile or as an adult. If it is determined that a juvenile sentence is appropriate, the case shall be dismissed. If it is determined that an adult sentence is appropriate, the trial court may take into account the defendant's conduct while he was in the custody of juvenile authorities, shall calculate and apply the sentencing guidelines in force when the defendant committed his offenses, and grant credit for time served in the juvenile system.

Reversed and remanded.

1. SENTENCES — JUVENILE SENTENCES — ADULT SENTENCES — APPEAL.

A bifurcated procedure is employed in the appellate review of a trial court's decision to impose on a minor convicted as an adult a juvenile sentence or an adult sentence; first, the trial court's findings regarding statutory factors is reviewed for clear error; second, the ultimate decision whether to sentence as a juvenile or as an adult is reviewed for abuse of discretion (MCL 769.1[3]; MSA 28.1072[3]; MCR 6.931[E][3]).

2. SENTENCES — JUVENILES — RESENTENCING — CONSTITUTIONAL LAW — DOUBLE JEOPARDY.

The resentencing of an individual who was sentenced as a juvenile upon conviction as an adult and who has been discharged from the juvenile system upon reaching the age of twenty-one does not violate the individual's constitutional protection against double jeopardy where the original sentence was invalid (US Const, Am V; Const 1963, art 1, § 15).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Douglas P. Dwyer*, Assistant Prosecuting Attorney, for the people.

*James Krogsrud*, for the defendant.

Before: WHITBECK, P.J., and SAAD and HOEKSTRA, JJ.,
WHITBECK, P.J.

### I. INTRODUCTION

Defendant, Lamphone Thenghkam, pleaded guilty of second-degree murder, MCL 750.317; MSA 28.549, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), crimes he committed at the age of sixteen. The trial court originally sentenced[1] him as a juvenile.[2] The prosecutor appealed, and this Court reversed and remanded for "reconsideration concerning whether defendant should be sentenced as an adult or a juvenile." *People v Thenghkam,* unpublished opinion per curiam of the Court of Appeals, issued June 13, 1997 (Docket No. 182588). The trial court, on remand, again sentenced Thenghkam as a juvenile.

### II. NATURE OF THE INSTANT APPEAL

The prosecutor now appeals for the second time, contending that the trial court misconstrued its duty on remand as simply reconsidering its earlier findings and decisions rather than addressing the question of sentencing anew. Therefore, the prosecutor asks this

---

[1] For the sake of simplicity, although we are mindful of the differences between a juvenile disposition and an adult sentence as outlined below, we refer to the consequences the trial court imposed on Thenghkam for his crimes as a "sentence."

[2] We know from material in the record that if the trial court had sentenced Thenghkam as an adult, the sentencing guidelines in place at the time would have recommended a *minimum* sentence of eight to twenty-five years' imprisonment. Instead, because the trial court sentenced Thenghkam as a juvenile, the *maximum* time the trial court could exercise jurisdiction over him in any manner was for about five years.

Court to order the trial court to resentence Thenghkam again.

Thenghkam, however, argues that the trial court's findings on each of the statutory factors, MCL 769.1(3); MSA 28.1072(3), relevant to the decision whether to sentence him as a juvenile or adult on remand were not clearly erroneous. Accordingly, he contends, there are no grounds to support resentencing for a second time. Thenghkam further argues that remand for a second resentencing would violate his constitutional right to due process of law and his right to be free from multiple punishments for the same offense under the aegis of double jeopardy.

### III. FACTUAL BACKGROUND

This Court summarized the facts underlying this case in its previous, unpublished opinion:

> [D]efendant and four friends were walking in defendant's neighborhood at approximately 9:00 P.M. on October 15, 1993. Three young men, including the decedent [Darryl Woodard, Jr.], were approaching defendant's group from the opposite direction. A member of defendant's group shouted at the decedent's group. There was no response after which another member of defendant's group shouted at the decedent's group. Defendant then drew his rifle and fired. Six bullets struck the decedent in the back, killing him.[3] The

---

[3] It is unclear how this Court determined that Woodard was shot six times. At the preliminary examination, Woodard's brother testified that five or six shots were fired and the investigating officer testified that Thenghkam admitted to firing three to five shots. The medical examiner's report indicated that four bullets struck Woodard in the back: two over his left hip, one to the right of his spine, and one close to his side that passed through soft tissue and struck his left wrist. At sentencing, the prosecutor did not dispute that Woodard had been shot four times, but did state at one point that Thenghkam fired six shots, four of which hit

decedent was unarmed and eyewitnesses reported that the decedent was running away when defendant shot him.

Defendant reported that he previously had been shot at in his neighborhood and that he feared being shot. He had been carrying a two-foot-long rifle in his pants for about a week before the shooting. Defendant claimed that during this incident one of the young men in the decedent's group pointed a shiny object towards him that he thought was a gun. Defendant explained that he was not aiming at the decedent and the others but just pulled the trigger to scare them away and started running.

*　　*　　*

At defendant's dispositional hearing, four individuals testified regarding the propriety of adult or juvenile placement. These included: (1) Gloria Singleton, a DSS/FIA social worker; (2) Deborah Starr, a clinical psychologist; (3) Ardyn Early, the presentence investigator; and (4) Anthony Keeling, the Recorder's Court Psychiatric Clinic examiner. Singleton and Starr recommended that the court sentence defendant as a juvenile; Early and Keeling recommended an adult sentence for defendant.

Singleton noted that defendant had over 250 absences from school; nonetheless, he obtained passing grades in all courses because he is a "smart kid." Also relevant to Singleton was the fact that defendant had conformed to routines at the youth home, except for one small altercation when he was first admitted. At home, defendant did not cause problems and worked to help support the family. Defendant's employer praised him as a quiet young man with good manners. Starr believed that the homicide was an "isolated incident." She did not believe that defendant posed a danger to society. She stated that defendant's behavior was indicative of the neighborhood, which was dangerous and plagued by gangs. Starr felt that the juvenile system could provide defendant with supervision, education, therapy and

---

Woodard. In any event, the distinction is irrelevant. No matter the number of shots, Thenghkam shot Woodard multiple times in the back, killing him.

coping skills. Starr thus concluded that defendant should be sentenced as a juvenile.

In contrast, Early recommended an adult sentence because defendant shot the victim in the back as the victim turned to run. Early opined that defendant displayed a callous disregard for human life. Early acknowledged, however, that defendant would not disrupt the rehabilitation of others at the juvenile facility. In her opinion, defendant did not pose a danger to the community; nevertheless, she advised sentencing as an adult given the seriousness of the crime. Keeling felt that defendant lacked good judgment and decision-making skills. Keeling characterized defendant as having a behavior problem and as being rebellious. Keeling speculated that defendant might be involved in gang activity; however, the youth bureau had no knowledge of an Asian gang in defendant's neighborhood. Keeling felt that defendant was intelligent, but associated with people who got into trouble, and had difficulty accepting authority. Thus, Keeling concluded that defendant should be sentenced as an adult.

According to Thenghkam's brief, in June 1998, he reached twenty-one years of age and the juvenile authorities discharged him from their custody.

## IV. LEGAL CONTEXT: TRYING AND SENTENCING MINOR DEFENDANTS

### A. INTRODUCTION

Trying and sentencing minors for criminal offenses has long been a controversial issue.[4] Notoriety sur-

---

[4] See, e.g., Beyer, *Recognizing the Child in the Delinquent*, 7 Ky Children's Rts J 16 (Summer 1999); Fagan, *Juvenile Justice Policy and Law: Applying Recent Social Science Findings to Policy and Legislative Advocacy*, 183 PLI/Crim 395 (1999); Van Vleet, *The Attack on Juvenile Justice*, 564 Annals Am Acad Pol & Soc Sci 203 (1999); Note, *Alternatives in the Treatment of Juvenile Offenders: Current Options and Trends*, 19 J Juv L 318 (1998).

rounding a number of recent cases involving criminal offenses by individuals under age eighteen has heightened the debate over the wisdom or necessity of applying the laws and criminal procedure designed for adults to people whose families, much of society, and certainly the law consider children.[5] Therefore, in order to set the context for our decision in this appeal, we think it is provident to outline the various options Michigan courts have for trying and sentencing minors who commit criminal offenses.

## B. FAMILY COURT JURISDICTION

Ordinarily, the family division of the circuit court (family court), formerly the probate court, exercises jurisdiction over individuals seventeen years old and younger. MCL 712A.2(a)(1); MSA 27.3178(598.2)(a)(1). The unique feature of the family court is the civil, and not criminal, nature of its proceedings, known as adjudications. MCL 712A.1(2); MSA 27.3178(598.1)(2). If a juvenile commits a crime and through an adjudication is determined to be within the family court's

---

[5] See Santiago Esparza, *Youth, 13, Spared Life in Prison*, Detroit News, Feb 12, 1999 (visited Dec 9, 1999) <http://detnews.com/1999/metro/9902/12/02120153.htm> (McKinley Moore was convicted of second-degree murder for the July 1998 shooting death of Calvin Lee Whitlow and sentenced as a juvenile); Bryan Robinson, *13-year-old Convicted of Second-Degree Murder* (updated Nov 16, 1999; visited Dec 9, 1999) <http://www.courttv.com/trials/abraham/111699_verdict_ctv.html> (jury in an adult trial convicted Nathaniel Abraham for a murder he committed at age eleven); *Port Huron Student Pleads Guilty*, Detroit News, Dec 8, 1999, Metro Section (visited Dec 9, 1999) <http://detnews.com/1999/metro/9912/08/ 12080080.htm> (four boys were accused of planning a massacre at their middle school; two pleaded guilty to assault with intent to commit great bodily harm and may be sentenced as juveniles; a third boy will be tried as a juvenile; the prosecutor dropped charges against the fourth boy).

jurisdiction,[6] then the family court has broad author-
ity to sentence the juvenile in a manner that best
suits the juvenile and society's interests. MCL
712A.1(3); MSA 27.3178(598.1)(3), MCL 712A.18; MSA
27.3178(598.18); MCR 5.943(E). In keeping with the
civil nature of the adjudication, juvenile sentences,
known as dispositions, can range from a warning,
fine, or community service to placement in an
institution or boot camp. MCL 712A.18; MSA
27.3178(598.18). Those sentences, however, terminate
automatically once the juvenile turns eighteen years
old or, in some circumstances, twenty-one years old.
MCL 712A.5; MSA 27.3178(598.5), MCL 712A.2a; MSA
27.3178(598.2a).

### C. TRADITIONAL WAIVER

If, however, the minor is over age fourteen[7] when
charged with conduct amounting to a felony had the
minor been an adult, the prosecutor has the
discretion to ask the family court to waive its juris-
diction over the juvenile. MCL 712A.4(1); MSA
27.3178(598.4)(1); see also MCR 5.950; *People v Hana*,
443 Mich 202; 504 NW2d 166 (1993) (there is no con-
stitutional right to be treated as a juvenile and differ-
ently from adults). The family court, after it conducts
a hearing, must determine if there is probable cause
to believe that the juvenile committed a felony and
whether the facts pertinent to each statutory

---

[6] Meaning that the court or a jury found that the prosecutor (petitioner)
proved beyond a reasonable doubt that the juvenile (respondent) commit-
ted the charged offense. See MCR 5.943(A).

[7] At the time Thenghkam committed the instant offense, the statute
only permitted jurisdictional waiver for minors who were at least fifteen
years old. See historical notes to MCL 712A.4(4); MSA 27.3178(598.4)(4).

factor weigh in favor of a juvenile adjudication or an adult trial.[8] See MCL 712A.4(4); MSA 27.3178(598.4)(4) (statutory factors include seriousness of offense, juvenile's culpability in the charged offense, prior record of delinquency, willingness to participate in programming, adequacy of punishment or programs available in juvenile system, and the dispositions available); *Hana, supra* at 221-224 (requirements for waiver hearing). If the juvenile has ever been subject to the jurisdiction of a circuit court or the former recorder's court, the family court *must* waive jurisdiction.[9] MCL 712A.4(5); MSA 27.3178(598.4)(5). A juvenile convicted of an offense

---

[8] Before being amended by 1996 PA 262 and when Thenghkam committed murder, the statutory factors involved in the waiver decision were:

    (a) The prior record and character of the child, his or her physical and mental maturity, and his or her pattern of living.
    (b) The seriousness of the offense.
    (c) Whether the offense is part of a repetitive pattern of offenses which would lead to 1 of the following determinations:

        (i) The child is not amenable to treatment.
        (ii) That despite the child's potential for treatment, the nature of the child's delinquent behavior is likely to disrupt the rehabilitation of other children in the treatment program.
    (d) Whether, despite the child's potential for treatment, the nature of the child's delinquent behavior is likely to render the child dangerous to the public if released at the age of 19 or 21.
    (e) Whether the child is more likely to be rehabilitated by the services and facilities available in adult programs and procedures than in juvenile programs and procedures.
    (f) Whether it is in the best interests of the public welfare and the protection of the public security that the child stand trial as an adult offender. [See historical notes to MCL 712A.4(4); MSA 27.3178(598.4)(4).]

The court weighed these factors as was "appropriate to the circumstances." *Id.*

[9] This provision did not exist in the former version of the statute.

in the circuit court pursuant to this waiver provision must be sentenced in accordance with MCL 769.1(3); MSA 28.1072(3), which permits the court to impose an adult or juvenile sentence[10] on the basis of findings relevant to explicit criteria and the way the court weighs those findings. See also MCR 6.931.

### D. AUTOMATIC WAIVER

The prosecutor, alone, has the discretion to decide to charge and try a juvenile, age fourteen or older, as an adult for a select group of seventeen[11] specified offenses, along with any lesser included offenses, or the crimes of attempt, conspiracy, or solicitation to commit those enumerated offenses; generally speaking, these enumerated offenses are among the most serious acts made criminal under Michigan law, such as murder and carjacking. MCL 764.1f; MSA 28.860(6); see also *People v Conat*, 238 Mich App 134; 605 NW2d 49 (1999) (history of the statute and recent amendments). By filing a complaint in a circuit court against a juvenile for one of the enumerated offenses, the prosecutor "automatically" waives the family court's jurisdiction and vests jurisdiction of the case in the circuit court. MCL 764.1f(1); MSA 28.860(6)(1). Hence, this is known as the "automatic waiver" statute. If convicted of an enumerated offense, which is actually a subset of the seventeen offenses that fall under the automatic waiver provision, the circuit

---

[10] The court can revoke a juvenile sentence of probation and impose an adult sentence for the original offense if the juvenile is later convicted of a felony or misdemeanor punishable by imprisonment for more than one year. MCL 771.7(1); MSA 28.1137(1).

[11] Formerly, the statute permitted automatic waiver for nine specified offenses, including second-degree murder. See *Hana, supra* at 223, n 59.

court *must* impose an adult sentence on the juvenile, as determined by statute and sentencing guidelines. MCL 769.1(1); MSA 28.1072(1). The circuit court retains the authority, within the limits MCL 769.1(3); MSA 28.1072(3) imposes, to sentence the juvenile to an adult or juvenile sentence for the remaining offenses.

### E. TRIAL AND SENTENCING OPTIONS APPLIED HERE

In summary, under Michigan law a minor can be (1) tried and sentenced as a juvenile, (2) tried as an adult and sentenced as a juvenile, or (3) tried and sentenced as an adult.[12] Depending on the offense charged, the automatic waiver statute and the mandatory adult sentencing provision may require this third option. Similarly, if the juvenile was previously under the jurisdiction of the recorder's court or the circuit court, this third option is mandatory. In all remaining circumstances, however, the prosecutor has discretion to request an adult trial or sentence and the court must exercise its discretion, as shaped by the relevant statutory considerations, in deciding whether to try or sentence a minor as a juvenile or an adult.

In this case, the prosecutor requested option three, above, but the trial court ultimately applied option two. That is, because the prosecutor charged

---

[12] Michigan law currently permits delayed sentencing for juveniles tried as adults in "designated" cases. See MCL 712A.18(1)(n); MSA 27.3178(598.18)(1)(n); see also MCL 712A.2d; MSA 27.3178(598.2d). Under this system, the family court can delay sentencing for a juvenile until the juvenile becomes an adult. In the interim, while the juvenile is still a minor, the court imposes probation. This scheme, however, does not apply to Thenghkam because it was enacted in 1997, after he committed the homicide.

Thenghkam with second-degree murder, the auto-
matic waiver statute as it appeared in 1993 vested
jurisdiction in the now-defunct recorder's court, the
former court of general jurisdiction for criminal
offenses in the city of Detroit, over that charge as
well as the felony-firearm charge. However, because
the statute had yet to undergo amendment to provide
for the mandatory adult sentence for second-degree
murder, MCL 769.1(1)(h); MSA 28.1072(1)(h),[13] the
recorder's court retained the discretion to sentence
Thenghkam as an adult or a juvenile under MCL
769.1(3); MSA 28.1072(3). See also MCR 6.931; *People
v Parrish*, 216 Mich App 178, 183; 549 NW2d 32
(1996). We examine the relevant criteria, the trial
court's decision, and its foundation in the record in
section V(B) of this opinion.

### V. THENGHKAM'S SECOND JUVENILE SENTENCE

#### A. STANDARD OF REVIEW

##### (1) INTRODUCTION

This Court employs a bifurcated procedure to
review a trial court's decision to sentence a minor as
a juvenile or as an adult. First, we review the trial
court's factual findings supporting its determination
regarding each statutory factor for clear error. *People
v Launsburry*, 217 Mich App 358, 362; 551 NW2d 460
(1996). This first part of the inquiry focuses on

---

[13] At the time Thenghkam pleaded guilty the statute merely said that a
"judge of a court having jurisdiction is authorized and empowered to pro-
nounce judgment against and pass sentence upon a person convicted of
an offense in that court. The sentence shall not be in excess of the sen-
tence prescribed by law." MCL 769.1(1); MSA 28.1072(1).

whether the court made a required finding of fact and whether the record supports that relevant finding; the absence of a required finding of fact or a factual finding without support in the record constitutes clear error. See generally *People v Faucett*, 442 Mich 153, 170; 499 NW2d 764 (1993); *Bivins v Bivins*, 146 Mich App 223, 234; 379 NW2d 431 (1985). Second, we review the ultimate decision whether to sentence the minor as a juvenile or as an adult for an abuse of discretion. *Launsburry, supra* at 362. This second part of the analysis scrutinizes how the court weighed its factual findings to come to the ultimate sentencing decision. See *People v Perry*, 218 Mich App 520, 542; 554 NW2d 362 (1996), aff'd on other grounds 460 Mich 55; 594 NW2d 477 (1999).

This bifurcated procedure requires a reviewing court to exercise great discipline. The temptation to substitute the reviewing court's own view of the underlying evidence for the trial court's assessment is often extraordinarily seductive and, understandably, extraordinarily difficult to resist. See *People v Farrow*, 461 Mich 202, 208-209; 600 NW2d 634 (1999). Nevertheless, the appellate court has no authority to look at the issues on appeal as if it had been the trial court.[14] Similarly, reviewing courts err when they ana-

---

[14] This statement is subject to some qualification. In *Tuttle v Dep't of State Hwys*, 60 Mich App 642, 647-648; 231 NW2d 482 (1975) (*Tuttle I*), this Court stated that "[i]n order for us to accept plaintiff's premise we would have to substitute our judgment for that of the trial court. This we may not do." The Michigan Supreme Court reversed, in the process categorizing this Court's view of its reviewing function in a nonjury case as unduly restrictive. *Tuttle v Dep't of State Hwys*, 397 Mich 44, 46; 243 NW2d 244 (1976) (*Tuttle II*). We suspect that had this Court phrased its "substitution of judgment" comment in *Tuttle I* along the lines of this Court's earlier reformulation of the holding in *Williams v Dep't of State Hwys*, 44 Mich App 51; 205 NW2d 200 (1972), it would have escaped the

lyze the trial court's exercise of discretion as if they, the appellate courts, had discretion on the underlying legal question. Because the process of straying, step by step and gradation by gradation, from the "clear error" and "abuse of discretion standards" when considering the underlying evidence and legal decision can be remarkably difficult to discern, we take this opportunity to explain the standard of review in more detail.

### (2) STEP ONE: CLEAR ERROR

The "clearly erroneous" standard is easier to cite than to explain. The classic formulation is that a trial court's findings are clearly erroneous "if, after a review of the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gistover*, 189 Mich App 44, 46; 472 NW2d 27 (1991). The chain of cases cited in *Gistover* ultimately reveals the foundation for this oft repeated standard: *United States v United States Gypsum Co*, 333 US 364; 68 S Ct 525; 92 L Ed 746

---

"unduly restrictive" comment of the Supreme Court in *Tuttle II*. That reformulation, contained in *Nat'l Bank of Detroit v State Hwys Dep't*, 51 Mich App 415, 417; 215 NW2d 599 (1974), was that "[a]n appellate court will not substitute its judgment for the trial judge sitting as a finder of fact, *unless his decision is clearly erroneous*." (Emphasis supplied.) The actual holding in *Williams*, however, was that "[u]nless the trial judge's decision is *contrary to the clear preponderance of the evidence*, we will not substitute our judgment for his." *Williams, supra* at 54 (emphasis supplied). The upshot is that a reviewing court may not substitute its judgment for the trial court's, or base its review on what the reviewing court might have found or determined had it been sitting as the trial court, *unless the decision of the trial court is clearly erroneous*. In practice, this leaves us with a circular process: an appellate court is not to substitute its judgment for that of the trial court unless, by substituting its judgment for that of the trial court, it determines that the trial court's decision was clearly erroneous.

(1948).[15] There, the United States Supreme Court construed the "clearly erroneous" language in Rule 52(a) of the Federal Rules of Civil Procedure. Rule 52(a) prescribed that findings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[16] The *Gypsum* Court explained that

> [s]ince judicial review of findings of trial courts does not have the statutory or constitutional limitations on judicial review of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where "clearly erroneous." The practice in equity prior to the present Rule of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. [333 US 395.]

---

[15] *Gistover, supra* at 46, citing *People v Stoughton*, 185 Mich App 219, 227; 460 NW2d 591 (1990), citing *Tuttle II, supra* at 46, citing *Gypsum*. *Gypsum* was a civil case under the Sherman Act. Michigan courts apparently have not been troubled by applying a civil standard of review to criminal appeals, see *Gistover* and *Stoughton, supra*, and we see no reason to distinguish between the two for purposes of this appeal.

[16] At the time the Michigan Supreme Court decided *Tuttle II* in 1976, the counterpart rule in Michigan was GCR 1963, 517.1, which provided that an appellate court will set aside the findings of fact of a trial court sitting without a jury when such findings are clearly erroneous. See *Tuttle II, supra* at 46. The current counterpart rule is MCR 2.613(C), which provides:

> Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.

As is fairly clear, in *Gypsum* the United States Supreme Court did little more than announce the "firm and definite conviction" slogan without a great deal of elucidation. At best, *Gypsum* reveals two principles. First, reviewing courts must give less deference to the factual findings of trial judges than to the factual findings of juries, even though the trial court's findings still have "great weight." *Id.* Second, a trial court's factual findings may be clearly erroneous even when there is some evidence to support them.

Michigan decisions, at least implicitly, recognize both *Gypsum* principles. In *Tuttle v Dep't of State Hwys*, 397 Mich 44, 46; 243 NW2d 244 (1976) (*Tuttle II*), which touched on the first principle, the Michigan Supreme Court compared the function of appellate review to a "judicial sieve." The Court stated that the sieve with which it sifted the evidence in that nonjury case was of "finer mesh" than the one correspondingly employed on review of a jury's verdict.[17] *Id.*

---

[17] At 397 Mich 46, n 3, the *Tuttle II* Court was careful to note that the comparison between appellate review and a sieve actually derived from an earlier case, *Schneider v Pomerville*, 348 Mich 49, 54-55; 81 NW2d 405 (1957). There the Court said:

Our duty under said Rule 64 . . . is to sift the evidence for determination whether it clearly preponderates in favor of the appellant's cause. Necessarily, the judicial sieve will be of finer mesh than the one correspondingly employed here on review of a denial of motion for new trial in a jury case. . . . A jury's verdict-view of facts is entitled to an even higher degree of appellate respect than is a judge's verdict-view of the same facts, learned though the judge may be in law. For reasons known well to students of American history, a finding of fact by "the twelvers" is more apt to be sound than that of one man. If this be right, our task at bar is bound to be a more difficult one than if the judgment below had been entered on verdict of a jury. When in rare instance a jury's verdict is judged contrary to overwhelming weight of evidence, the conclusion must be so obvious that verdict-sustaining argument loses all force. On the other hand, when evidence is appraised to determine clear pre-

Phrased another way, it is fairly clear that Michigan's appellate courts traditionally exercise a broader review of a judge's decision than of jury verdicts. See *Brady v Michigan Consolidated Gas Co*, 31 Mich App 498, 499, n 1; 188 NW2d 58 (1971).

The Michigan view on the second *Gypsum* principle, that findings may be clearly erroneous although supported by some evidence, is considerably less easy to identify. It goes without saying that, in most contested matters, the evidence regarding a set of facts or set of issues often conflicts. As a result, the trial court sitting as a finder of fact must make fine-line judgments about credibility, reliability, and probative value concerning the conflicting evidence to determine what actually occurred in a given case, i.e., the facts.[18] See *Farrow, supra* at 208-209, quoting *People v Burrell*, 417 Mich 439, 448-449; 339 NW2d 403 (1983). There are occasions, albeit relatively infrequent ones, when a trial court's assessment of those facts suffers from some shortsightedness. See, e.g., *People v Adams*, 232 Mich App 128; 591 NW2d 44 (1998); *Arnold v Darczy*, 208 Mich App 638, 640, n 1; 528 NW2d 199 (1995). In those circumstances where the trial court's findings do not accurately portray the factual background of the case, we conclude that the trial court "clearly erred." See *People v Lyons (On*

---

ponderance thereof, forceful argument each way subsists to the last and usually survives final judgment. [*Id.*]

[18] See *Random House Webster's College Dictionary* (2d ed) (a "fact" is: "something that actually exists"; "something known to exist or to have happened"; "a truth known by actual experience or observation"; "something said to be true or supposed to have happened"; "an actual or alleged event or circumstance, as distinguished from its legal effect or consequence").

*Remand)*, 203 Mich App 465, 470-474; 513 NW2d 170 (1994).

Overall, the clear error standard of review is still, at its heart, highly deferential to the trial court.[19] The important lesson of *Gypsum* is that appellate courts need not refrain from scrutinizing a trial court's factual findings, nor may appellate courts tacitly endorse obvious errors under the guise of deference.

### (3) STEP TWO: ABUSE OF DISCRETION

Under some statutory schemes, a trial court's findings lead invariably, and without any choice by the court, to a predetermined result. See *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 12-14; 596 NW2d 620 (1999). Accordingly, an appellate court's review in such a case would end after the "clear error" analysis because the trial court had no discretion to exercise. However, in the decision to sentence a defendant as a juvenile or an adult, a court's factual findings do not have independent relevance. A finding that, for example, a defendant is physically mature, MCL 769.1(3)(a); MSA 28.1072(3)(a), does not require the trial court to sentence the defendant either as a juvenile or as an adult. Rather, these factual findings facilitate the trial court's exercise of discretion, its

---

[19] See, e.g., MCR 2.613(C) ("Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, *regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.*") (emphasis added); *People v Zahn*, 234 Mich App 438, 445; 594 NW2d 120 (1999) ("The *deferential* 'clear error' standard is the appropriate standard of review for findings of fact because the trial court is usually in a superior position to assess the evidence.") (emphasis added); *People v Peerenboom*, 224 Mich App 195, 198; 568 NW2d 153 (1997) (appellate courts "defer" to trial courts on factual findings because they have the "superior ability to view the evidence and witnesses").

weighing process, when deciding how to sentence a defendant. See *Launsburry, supra* at 362; *Perry, supra* at 542-544.

As the language of MCL 769.1(3); MSA 28.1072(3) and MCR 6.931(E)(3) indicated at the time the trial court sentenced Thenghkam,[20] trial courts must consider all the findings on the statutory factors, "giving each weight as appropriate to the circumstances." See also *People v Cheeks*, 216 Mich App 470, 478-479; 549 NW2d 584 (1996) (trial court must consider and *balance* all the factors listed in the statute). That means that a trial court may not give the findings on any one factor "preeminence over the others," *Perry, supra* at 542, including the seriousness of the offense, *People v Rader*, 169 Mich App 293, 299; 425 NW2d 787 (1988). Quite clearly then, a trial court abuses its discretion by refusing to "weigh the relevant factors in [a] meaningful way." *People v Hazzard*, 206 Mich App 658, 661; 522 NW2d 910 (1994).

Furthermore, as with all judicial decisions that do not rest solely on the law, a trial court deciding whether to sentence a defendant as an adult or a juvenile must point to the requisite facts to justify its decision. See *People v Ullah*, 216 Mich App 669, 673; 550 NW2d 568 (1996). Consequently, and aside from the question of clear error, if the trial court fails to make findings of fact, it cannot fully exercise its discretion by giving proper weight to the various factors it must consider to make its decision under the sentencing statute. See generally *Alken-Ziegler, Inc v*

---

[20] Currently, the statute requires the trial court to consider all the findings on the statutory factors, but it must give more weight to the "seriousness of the alleged offense and the juvenile's prior record of delinquency." MCL 769.1(3); MSA 28.1072(3).

*Waterbury Headers Corp*, 461 Mich 219, 227-229; 600 NW2d 638 (1999);   *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959).

In sum, it is the trial court's execution of weighing and balancing its findings to support the decision to sentence a defendant as an adult or a juvenile that concerns the appellate court under this "abuse of discretion" analysis.[21] See *People v Dilling*, 222 Mich App

---

[21] There are cases that cite the principle of proportionality while addressing a trial court's' decision to sentence a minor defendant as a juvenile. See *Perry, supra* at 540 and the cases cited therein. However, two factors lead us to believe that proportionality does not shape appellate inquiry surrounding the decision regarding whether to sentence a minor as a juvenile or an adult.

First, proportionality ordinarily is relevant to the *actual sentence imposed* in light of the circumstances of the offense and offender for juveniles and adults alike. *People v Milbourn*, 435 Mich 630, 635; 461 NW2d 1 (1990); *Lyons (On Remand), supra* at 468. The issue we address here is the preliminary question of the sentence's form, not its substance, i.e., its length. Therefore, we question what we could view in terms of proportionality in this decision.

Second, the recent amendments of MCL 769.1(3);   MSA 28.1072(3) require a trial court to give greater weight to the seriousness of the offense and the juvenile's history of delinquency while eliminating any consideration of the best interests of the juvenile. These changes seem close to asking the trial court to impose a particular form of sentence as proportionality would dictate. In other words, for the most serious offenses, a time-limited juvenile sentence would almost always be foreclosed because it might not provide sufficient time for punishment if proportionality were the only consideration relevant to the form of sentence. However, in some cases, an adult or juvenile sentence may last the same amount of time, making proportionality meaningless when making the initial decision regarding the form of the sentence. Furthermore, both the older and newer versions of the statute consistently require a trial court to look beyond the circumstances of the offense and to consider other factors, such as whether suitable rehabilitative programs are available in the juvenile justice system, to determine what form of sentence is in the public's best interest. These considerations outside the boundaries of typical proportionality analysis may well influence the proper form of sentence to impose.

Accordingly, we do not conclude that appellate review of the way a trial court weighs its findings to decide how to sentence a minor defendant is strictly analogous to reviewing a court's sentencing decision when the defendant challenges the *length* of the sentence as disproportionate.

44, 52; 564 NW2d 56 (1997); *Lyons (On Remand)*, *supra* at 470-474. When the trial court gives unwarranted weight to one or more findings on the statutory factors, contradicting the language of the statute, the balance emphasized in case law, or the true circumstances as expressed in the record, we find an abuse of discretion. Similarly, the trial court's decision to proceed to weigh and balance the statutory factors after having failed to make all the required findings concerns appellate courts and may warrant resentencing because it demonstrates an abuse of discretion.

### B. CLEAR ERROR REVIEW OF THE TRIAL COURT'S FACTUAL FINDINGS

#### (1) THE STATUTORY FACTORS

The prosecution bears the burden of proving by a preponderance of the evidence that the best interests of the juvenile and the public would be served by sentencing the juvenile as an adult. MCR 6.931(E)(2).[22] At the time the trial court sentenced Thenghkam, both MCR 6.931(E)(3) and MCL 769.1(3); MSA 28.1072(3) required the trial court to consider the following six criteria to determine whether to sentence him as a juvenile or as an adult:

---

Therefore, we refrain from reducing appellate review of a trial court's decision regarding how to sentence a minor defendant to what has become the catchall phrase for sentencing questions: proportionality.

[22] We find it interesting that, even though MCL 769.1(3); MSA 28.1072(3) now focuses solely on the best interests of the public, the analogous court rule retains the requirement that the prosecutor prove by a "preponderance of the evidence that the best interests of the juvenile and the public would be served by imposing a sentence against the juvenile as though the juvenile were an adult offender." MCR 6.931(2).

(a) the juvenile's prior record and character, physical and mental maturity, and pattern of living;

(b) the seriousness and circumstances of the offense;

(c) whether the offense is part of a repetitive pattern of offenses which would lead to the determination:

(i) that the juvenile is not amenable to treatment, or

(ii) that, despite the juvenile's potential for treatment, owing to the nature of the delinquent behavior, the juvenile is likely to disrupt the rehabilitation of others in the treatment program;

(d) whether, despite the juvenile's potential for treatment, the nature of the juvenile's delinquent behavior is likely to render the juvenile dangerous to the public when released at age twenty-one;

(e) whether the juvenile is more likely to be rehabilitated by the services and facilities available in the adult programs and procedures than in the juvenile programs and procedures; and

(f) what is in the best interests of the public welfare and the protection of the public security.

## (2) THE FIRST FACTOR: PRIOR RECORD, CHARACTER, PHYSICAL AND MENTAL MATURITY, PATTERN OF LIVING

### (a) PRIOR RECORD AND CHARACTER

At the original sentencing hearing, the trial court noted that it had

> looked through the reports and I am not really that swayed . . . the reports indicate that the offense that he was charged with, carrying a concealed weapon . . . the petition was denied. The second offense that the was charged with was the breaking and entering. I read the report from Arden Earle's [sic] and the police officer that came to the scene said there was no damage to the store. It appeared that one of the young men worked in the restaurant and they did this through their own teaming up. There was an indication that found on Mr. Thenghkam was [sic] two paring knives

and a plastic one inside his right front pocket . . . [and] the
defendant was warned and released.

In the first appeal, this Court concentrated on the
concealed weapon offense, stating, "The second
charge, carrying a concealed weapon, MCL 750.227;
MSA 28.424, occurred *just six days after* defendant
committed the homicide." *Thenghkam, supra.* Fur-
ther, the opinion noted that "[p]ainfully absent from
its findings are facts surrounding the homicide and
the fact that *just six days after* the shooting occurred
defendant brought a loaded weapon to school." *Id.*

On remand, the trial court responded:

> With regard to the first concern, this court recognizes
> that it was totally inappropriate for the defendant to carry a
> flare, particularly given the proximity to defendant's homo-
> cide [sic] arrest. However, when viewed as a part of the
> totality of the circumstances surrounding the defendant's
> life, and his expressions of overall fear, the defendant's per-
> ception that he had to protect himself is understandable,
> although certainly not justifiable. As previously noted by
> this court, the defendant's cultural differences, as well as
> the death of his father, his brother's murder, and mother's
> life-threatening illness, are all circumstances of the defend-
> ant's environment which contributed to his feelings of inse-
> curity, and led him to continue to carry a flare-gun after the
> homocide [sic]. His fears had yet to subside, and certainly
> placement in the adult system would do nothing more than
> add to these feelings. What the defendant needs is place-
> ment in a facility, where he can receive counseling which
> will aide [sic] him in filtering out rational irrational ones
> [sic], and teach him how to address these feelings without
> resorting to unwarranted violence, or possession of
> weapons.

This rather remarkable statement is not a finding, but
appears to be a defense of Thenghkam's behavior.

The trial court used the mildest term possible, "inappropriate," essentially failing to recognize that this conduct was not only criminal, but felonious, indeed, murderous. The trial court then attempted to excuse this conduct by referring to Thenghkam's "environment" and "feelings of insecurity." Not only are these statements so generalized that they are virtually meaningless, they are a template for excusing *any* offense, from the most trivial to the most heinous. Furthermore, the trial court failed to comment on Thenghkam's character. As a result, we are left with the firm and definite conviction that the trial court made a mistake with respect to its findings regarding this element of the first factor.

### (b) PHYSICAL AND MENTAL MATURITY

At the original sentencing hearing, the trial court made the following findings concerning Thenghkam's physical and mental maturity:

> What you have to realize [is] that this juvenile who is small in stature, which the rules say that I should take into consideration, and of mental maturity. His pattern of living is somewhat chaotic. He is a young man from Laos who comes to a country where the cultural differences are tremendous. As soon as he gets here his father dies. His brother is killed and he basically is being raised be [sic, by] a 21 year old sister after his mother ends up with kidney failure. This is a chaotic situation but for some reason our country prefers to provide treatment rather than provide some kind of support for people like him. . . .

In our first opinion, this Court noted that the trial court's findings were devoid of any comment related to his mental maturity. *Thenghkam, supra.* Accordingly, on remand, the trial court responded:

> [W]ith regard to the defendants [sic] mental maturity, no testimony was presented which would indicate that the defendant was mentally immature. This court would more aptly describe him as "socially immature," and attribute this to the cultural shock which he undoubtedly experienced after coming to the United States from Laos, and then having been bombarded with one personal tragedy after another. In addition, to the fact that the defendant is small in stature, and often a target of bullies, lead to the conclusion [sic] that he has not had an opportunity to develop social skills equivalent to those of his peers.

Again, the trial court simply avoided dealing with the relevant elements of the first factor at all. Although noting that there was no evidence of mental immaturity, the trial court still failed to find defendant mentally mature, even though the record reveals that his intelligence was considered slightly above average and that he was the "man of the house," who worked to contribute to the well-being of the household. Rather, the trial court used "socially immature," which is not in the statute, and then amplified on that term. The trial court's comment that Thenghkam's small stature[23] appeared to make him a target for bullies completely avoided the question posed by the statute under this factor: whether Thenghkam was physically mature. At least one witness found Thenghkam to be physically mature, but the trial court completely disregarded this testimony and continued to equate, at least implicitly, smallness of stature with physical immaturity. As a result, we are left with the firm and definite conviction that the trial

---

[23] At the time of his arrest, Thenghkam was apparently 5'1" tall and weighed 120 pounds.

court made a mistake with respect to this element of
the first factor.

### (c) PATTERN OF LIVING

At the original sentencing hearing, the trial court
did not specifically deal with this element of the first
factor, other than to comment generally that
Thenghkam's "pattern of living is somewhat chaotic."
Similarly, this Court in our previous opinion, while
noting Thenghkam's rather remarkable personal his-
tory, did not comment either positively or negatively
on the trial court's brief reference to this element of
the first factor. Perhaps as a result, on remand, the
trial court did not comment further on this element.
Certainly, the finding that Thenghkam's life, before
the shooting, was "chaotic" is supported by ample evi-
dence in the record. Although the finding itself is gen-
eralized, and therefore would have little effect on a
subsequent attempt to balance the evidence to deter-
mine whether to sentence Thenghkam as an adult or
a juvenile, we conclude that the trial court did not
clearly err in making this observation.

### (d) CONCLUSION REGARDING THE FIRST FACTOR

On balance, we are left with the firm and definite
conviction that the trial court made a mistake with
respect to the first factor. We conclude that the trial
court's findings regarding this first factor, with the
exception of the court's finding with respect to
Thenghkam's pattern of living before the offense,
were clearly erroneous.

(3) THE SECOND FACTOR: THE SERIOUSNESS AND CIRCUM-
STANCES OF THE OFFENSE

At the original sentencing hearing, the trial court found that "[t]here is no offense known to Michigan law, other than first degree murder, to be more serious than this because a life was taken and some other young men were harmed." In the opinion in the first appeal, this Court stated:

> Regarding the seriousness of the offense, the court stated that "first"-degree murder was a serious offense under Michigan law. He sympathized with the decedent's mother and lamented the plague of easy access to guns among today's youth. But without further articulation, he summarily and surprisingly concluded that sending defendant to prison would not accomplish "anything." Such statements do not give each criteria weight as appropriate to the circumstances.
>
> *         *         *
>
> Most striking is the absence of findings discussing the disturbing facts of the homicide. The decedent was shoot in the back SIX times [sic]. Members of defendant's group made provocative and offensive comments towards the members of the decedent's group. Although defendant stated that he thought a member of the decedent's group pulled out something shiny, defendant's perception of danger is contradicted by the uncontested fact that the decedent and his companions were unarmed. Defendant also claims that he fired shots to scare decedent and others in the decedent's group because he himself was scared and running away. The court never addresses the incongruity of the defendant's statement that he hit a running target six times in the back while defendant was also running away. [*Thenghkam, supra.*]

On remand, the trial court responded:

> This court is well aware that weapons are easily accessible, which makes the prospect for violence in our neighborhoods and cities, an occurrence which has impacted the lives of everyone.
>
> However, the law of Michigan states that whatever the circumstances of the offense, no one factor, in particular the seriousness of the offense should be given "preemptive weight" *People v Spearman*, 195 Mich App 434, 448; 491 NW2d 606, (1992) [sic[24]].
>
> Although the summary of facts presented in the PSIR, does not support the defendant's statements regarding his belief that the decedent was armed, this court does not believe that defendant intentionally fabricated his version of the offense. There is nothing within the defendant's background which would support the conclusion that this was a planned homicide, or that the defendant had "incurable malice' [sic], as suggested by the prosecution. This court has presided over many cases where the evidence indicates that a defendant, based upon the circumstances of his life, believed that the victim was armed, although it was ultimately proven that he/she was not.
>
> In this case the defendant's overall fearfulness, obviously contributed to this belief, and to the incongruity in his statement that he and the victim were running in opposite directions at the time of the shooting.

Here, the trial court on remand made no factual findings whatsoever. Rather, the trial court again lamented the easy access to guns in our society, stated his opinion that Thenghkam had not "intentionally fabricated" his version of the shooting, rebutted the prosecution's contention of incurable malice, and essentially suggested that Thenghkam's belief—whether correct or incorrect—that the decedent was

---

[24] The trial court misread this dicta in *Spearman, supra* at 448. The prosecutor argued, but the *Spearman* trial court did not decide, that the court could not give the findings regarding any one factor "preemptive" weight.

armed not only explained but also expiated Thenghkam's behavior. The trial court then concluded by observing that Thenghkam's "fearfulness" somehow explained how Thenghkam could shoot the decedent in the back while he was running in the opposite direction.

While the trial court's last statement is simply illogical, we recognize that the balance of its comments were at least tangentially relevant to the *circumstances* of the offense. However, none of these statements had the slightest relevance to the *seriousness* of the offense. The best the trial court could do on this point was its observation, later in its opinion and after correcting its reference to first-degree murder rather than second-degree murder, that "the conduct of the defendant is inexcusable, and reprehensible." The trial court also later stated that "[t]here was no dispute that the offense was a serious one." We conclude that, indeed, it was. Thenghkam fired a hail of bullets at the defenseless victim, killing him. A trial court must articulate findings that show how or why the circumstances of the offense make it more or less serious. *People v Haynes*, 199 Mich App 593, 598; 502 NW2d 758 (1993). Bare conclusions regarding the seriousness of an offense are inadequate. *Id.* Likewise, findings that contradict a conclusion or have no connection to the ultimate question posed in the statute are clearly erroneous because they fail to provide the factual context necessary for determining how to sentence a minor defendant. The trial court's findings regarding this factor are troubling because they go to great lengths to mitigate Thenghkam's conduct, thereby failing to support the trial court's subsequent conclusion that the offense was very serious.

(4) THE THIRD FACTOR: REPETITIVE PATTERN OF OFFENSES

At the original sentencing hearing, the trial court stated:

> Is this offense a part of a repetitive pattern of offenses which would lead this Court to determine that this juvenile is untreatable. I don't think that it is. . . . Is there a possibility of a potential for treatment oweing [sic] to the nature of his behavior? It appears that since he has been in a structure [sic] situation at the Wayne County Youth Home his grades have went [sic] from D's and E's to A's and B's [sic]. It appears that if he is in a structured situation there is a possibility that he could be rehabilitated.

We did not explicitly criticize this finding in the first appeal and would be prepared to affirm this finding again. However, unfortunately, on remand the trial court simply failed to address this factor. That was clear error.

(5) THE FOURTH FACTOR: THENGHKAM'S POTENTIAL TO BE DANGEROUS TO THE PUBLIC WHEN RELEASED AT AGE TWENTY-ONE

At the original sentencing hearing, the trial court stated:

> The next factor I have to take into consideration is whether or not he would be a danger to society once he reaches the age of 21 when he would be released if I sentence him to the juvenile court [sic]. The experts from the Department of Social Services says [sic] yes and the Department of Corrections and Psychiatric Clinic of the Recorder's Court says [sic] no. I am in a position where I have to make a call based upon the preponderance of [the] evidence. In reviewing all of the reports that have been submitted to me and moved to be admitted by Mr. Spada, I am of the belief that he can be rehabilitated . . . .

The trial court, therefore, found that Thenghkam would not be a danger to society when released at age twenty-one. In our first opinion, we concluded that this finding was "unsettling given the disparities and absences" in the trial court's factual findings. In particular, we noted that some of the evidence indicated that Thenghkam changed his conduct to fit a particular situation, implying that he may have masked his true potential to be dangerous when around the authorities. On remand, the trial court responded:

> This court based its' [sic] conclusion that the defendant could be rehabilitated by age 21, upon the record and the reports submitted at the dispositional hearing.
>
> Ms. Gloria Singleton testified that Lamphone Thenghkam's "risk assessment" was low, and that he could be rehabilitated by age 21. Ms. Ardyn Early testified "I don't know if he would be." Mr. Keeling offered no specific testimony regarding this factor. Ms. Starr, who recommended the juvenile system, testified that Lamphone was not presently a danger to society, and would not be a danger to [society] so long as proper intervention was provided.
>
> This court does not agree with the analysis that the defendant changed his behavior to conform [sic] his environment. The record indicated that defendant was always mannerable [sic], and that he was always fearful. The testimony did not indicate that he had a propensity for violent or aggressive behavior, or that he had ever been involved in any type of assaultive crime prime [sic] to his offense. [Transcript references omitted.]

The trial court's second finding regarding this factor, which simply referred to its original finding and the evidentiary support for that finding, indicates the critical weakness in its overall analysis on remand. That is, the trial court interpreted its duty as merely to

respond to this Court's criticisms rather than to conduct its factfinding duty under MCL 769.1(3); MSA 28.1072(3) and MCR 6.931(E)(3) again. The clear effect of the final line in *Thenghkam, supra,* reversing the trial court's decision and remanding for resentencing, was that the trial court should have gone through the process of considering this factor again, rather than simply explaining the reasoning behind its first finding.

We cannot see how the trial court could conclude, on the basis of the opinion testimony of Singleton and Starr, that Thenghkam would not pose a danger to the public when released at age twenty-one. Those witnesses predicated their opinions on Thenghkam's ability to receive treatment, yet the trial court failed to find that he was amenable to treatment even if he received it. Thus, there is an unbridgeable gap in the reasoning that led to the trial court's finding regarding this factor. Moreover, when read carefully, this fourth factor, MCL 769.1(3)(d); MSA 28.1072(3)(d), required the trial court to consider the "nature of the juvenile's delinquent behavior" when determining if Thenghkam would be likely to pose a danger when released. Nowhere in the trial court's commentary regarding this factor does it refer to Thenghkam's delinquent conduct. Accordingly, we conclude that the trial court clearly erred with respect to the fourth factor.

### (6) THE FIFTH FACTOR: LIKELIHOOD FOR REHABILITATION IN ADULT PROGRAMS VERSUS JUVENILE PROGRAMS

At the original sentencing hearing, the trial court made no explicit findings regarding whether it was more likely that Thenghkam would be rehabilitated by the services and facilities available in adult pro-

grams and procedures than in juvenile programs and procedures. Rather, the trial court made conclusory findings that Thenghkam "can be rehabilitated" and that "rehabilitation is likely to be most accomplished in the juvenile facilities." We commented that that this was insufficient. *Thenghkam, supra.* On remand, the trial court appeared to respond to this concern, writing:

> Ms. Singleton testified that in the juvenile system the defendant would receive therapy and counseling. He would also have a positive peer culture and be required to go to school. Whereas, in the adult system these programs if available would be offered on a voluntary basis.
>
> Ms. Ardyn Early, testified that her recommendation for adult treatment was essentially based upon the seriousness of the offense. She admitted that based upon her observations the defendant would not disrupt the rehabilitation of others, nor be a danger to others in the juvenile facility.
>
> Mr. Keeling stated only that both the juvenile, and adult systems offered necessary structure.
>
> Ms. Starr testified more specifically. She stated that in order to prevent defendant from becoming involved in future criminal activity he would need therapeutic intervention, such as proper educational supervision, as well as treatment to aid in coping, development, and socialization skills. Ms. Starr indicated that the juvenile system is better equipped to provide this type of intervention than the adult system. [Transcript references omitted.]

Thus, the trial court once again avoided making a specific finding. Rather, the trial court simply summarized the evidence, without following our specific direction to reconsider, among other things, "the best system in which to accomplish rehabilitation." *Thenghkam, supra.* Essentially the trial court went to great lengths to revive its first decision on its original reasoning. We are therefore left with the firm and def-

inite conviction that the trial court committed clear error by failing to make a factual finding with respect to the fifth factor.

### (7) THE SIXTH FACTOR: BEST INTERESTS OF THE PUBLIC WELFARE AND THE PROTECTION OF PUBLIC SECURITY

At the original sentencing hearing, the trial court made no specific findings concerning the best interests of the public welfare and the protection of the public security. Rather, the trial court made a conclusory statement that this factor weighed in favor of Thenghkam's placement in the juvenile system, without any explanation of the supporting evidence or reasoning. Citing *Cheeks, supra*, this Court concluded that

> [i]t is imperative that a sentencing court consider and articulate findings regarding all the statutory factors, to allow for proper resolution of whether society's interest in public protection is adequately balanced against a juvenile defendant's potential for rehabilitation. [*Thenghkam, supra.*]

On remand, the trial court responded:

> In undertaking this analysis this court is well aware that the ultimate goal of sentencing is to protect society through just and certain punishment reasonably calculated to rehabilitate. *People v Cheeks, 216 Mich App 470, 478-479; 549 NW2d 584 (1996) citing People v Shultz, 435 Mich 517, 532; 460 NW2d 505 (1990)* [sic].
>
> Furthermore, the court recognizes that the public must be protected from dangerous individuals who commit heinous and violent crimes, regardless of whether the individual is a juvenile or an adult. *Id.* In resolving the conflicting tensions between protecting society and rehabilitating the juvenile, the court has considered, balanced, and addressed,

all of the factors listed in MCL 769.1(3)(a)-(f); MSA 28.1072(3)(a)-(f).

The record, and the reports presented at the hearing, indicate to the court that the best interests of the public welfare would be accomplished by sentencing the defendant as a juvenile.

As noted within, the defendant has no history of assaultive conduct, he was not disruptive at the youth home, but rather cooperative and remorseful, and clearly amenable to the programs available in the juvenile system. There is no dispute that the offense was a serious one. This court, for reasons elaborated upon earlier, does not find the offense to represent a pattern of criminal behavior. None of the experts who testified reached the conclusion that the defendant was likely to be a danger to the public on his release at age twenty-one, *People v Brown, 205 Mich App 503; 517 NW2d 806 (1994)* [sic].

The trial court attempted to support its summary finding regarding this factor by recapitulating the findings it made with respect to *other* statutory factors. Had the Legislature intended that the sixth factor act as a catchall for the previous five factors, we believe that it would have said so. We are therefore left with the firm and definite conviction that the trial court made a mistake with respect to the sixth factor.

### (8) THE GRAVEL CASES

In terms of the type and seriousness of an offense, as well as the analysis under the statutory factors for determining the proper form of sentence for a minor defendant, there are notable similarities between this case and what are known as the Gravel cases. *Brown, supra; People v Miller,* 199 Mich App 609; 503 NW2d 89 (1993); *Haynes, supra.* On February 8, 1990, Kermit Haynes, Cortez Miller, Willie Hobbs, and Greg-

ory Brown and two others spent the day trying to steal cars in Detroit by pointing a gun at drivers to make the drivers stop. *Haynes, supra* at 594-595. After several unsuccessful attempts to get drivers to stop, Haynes took the gun from one of the other young men in order to instruct the others on how to carry out the crime. *Id.* at 595. The group then went to a road near the Bayview Yacht Club in Detroit because "there ain't no houses or people and because there's nice cars there," placed a tree in the road to force vehicles to stop, and waited for a victim. *Id.*; *Brown, supra* at 507. Several cars were able to pass the tree before Benjamin Gravel, who had been at the yacht club, drove near the boys. *Haynes, supra* at 595. When Gravel would not stop, Haynes approached the car, shouted to Gravel to stop and, when he did not stop, Haynes fired into the driver's side of the car as it drove down the road. *Id.* The young men then ran to a store, where Brown purchased additional bullets. *Brown, supra* at 507. Later that evening they learned that Gravel died from his gunshot wounds. *Id.* When Brown asked Haynes why he had fired at Gravel so many times, Haynes reportedly replied that Gravel should have "stopped and I wouldn't have smoked his ass." *Id.* In Haynes' estimation, Gravel "killed hisself [sic]." *Id.*

The prosecutor charged Haynes, Miller, Brown, and Hobbs with different combinations of assault with intent to rob while armed, MCL 750.89; MSA 28.284, felony-firearm, MCL 750.227b; MSA 28.424(2), and first-degree murder, MCL 750.316; MSA 28.548, or second-degree murder, MCL 750.317; MSA 28.549, as adults, and they each pleaded guilty of their respective charges. After making findings regarding the stat-

utory factors relevant to sentencing a minor as an adult or a juvenile, the trial court[25] sentenced each defendant as a juvenile. The prosecutor appealed. This Court affirmed the decision to sentence Brown and Hobbs as juveniles, but concluded that the trial court clearly erred with it findings supporting juvenile sentences for Miller and Haynes. *Brown, supra* at 506; *Miller, supra* at 616; *Haynes, supra* at 603. In particular, the Court determined that the trial court erred in failing to take into consideration all the evidence and testimony regarding some factors and making conclusions regarding other statutory factors without first making complete factual findings. *Miller, supra* at 613-616; *Haynes, supra* at 597-603. These errors were sufficient to warrant resentencing Miller and Haynes. *Miller, supra* at 616; *Haynes, supra* at 603. The results in those cases are highly suggestive of the proper result in this case, where the trial court, after a second chance to make proper findings on remand, still failed to discharge its statutory duty. Furthermore, we gather from the published opinions in *Miller* and *Haynes* that the trial court's fact-finding errors were not nearly as extensive as in this case, where the finding regarding only one element of the first factor was wholly correct.

### (9) CONCLUSION

The length of this opinion and the depth of the analysis should not give the wrong impression of this Court's reviewing function. We have refrained from

---

[25] Judge Dalton A. Roberson presided over the instant case as well as the Gravel cases. See also *Lyons (On Remand), supra; People v Haynes (After Remand)*, 221 Mich App 551; 562 NW2d 241 (1997).

second-guessing the trial court's finding regarding each factor, specifically centering our focus on the record and identifying instances where the trial court did not err. However, we are left in the unfortunate position of having to guess at the appropriate findings under some of the statutory criteria because the trial court simply failed to discharge its duty by making the findings itself. Similarly, at times the trial court, while attempting to make a finding, strayed so far from the relevant subject of the statutory factor that it appeared to become an advocate, seeing the case solely from the perspective of the defense and ignoring countervailing evidence plainly on the record. A trial court must *sort* the logical, reasonable, and believable evidence on the record from the incredible or irrelevant evidence to make factual findings. Yet, there was no indication that the trial court in this case had a sufficiently broad view of the record to carry out this necessary task. See *Miller, supra; Haynes, supra*. Accordingly, we have no choice but to conclude that the trial court clearly erred.

## C. ABUSE OF DISCRETION

As we noted above, once a trial court makes its findings of fact the statute obligates the trial court to consider and balance all the factors to decide whether to sentence a defendant as a juvenile or an adult. *Cheeks, supra* at 478-479. Even assuming that the trial court's scant findings touched on every factor and were not clearly erroneous, we do not see how the trial court considered and balanced them all, giving appropriate weight to particular factors under the circumstances of this case. See *Perry, supra* at 542; *Hazzard, supra* at 661. For instance, the portion

of the trial court's written opinion on remand that purportedly weighed and balanced all the findings mentions only *one* factor about Thenghkam or the offense that would support an adult sentence, namely that the "offense was a serious one." We cannot imagine how the trial court could note that this offense was "serious," "inexcusable," and "reprehensible," in its factual findings but still fail to give the seriousness of the offense any appreciable weight in the ultimate decision by addressing it in what seems to be almost a dismissive tone. See *Haynes, supra* at 598 ("[M]erely characterizing the offense as one of 'ultimate gravity' begs the question whether the circumstances surround the offense should be given more weight in deciding to sentence a defendant as an adult."). We cannot look at the record as the trial court did and conclude that it completely lacked evidence supporting an adult sentence other than the seriousness of the offense. Certainly Thenghkam's truancy, difficulty with authority, and the conflicting testimony regarding the best form of sentence for him merited some mention, even if the trial court ultimately concluded that these factors did not outweigh the evidence supporting a juvenile sentence.

Viewed as a whole, the trial court's opinion on remand is basically an extended apologia for Thenghkam's criminal behavior.[26] As this Court said in the first appeal, the trial court "gave positive factors ample consideration and negative factors short shrift

---

[26] See generally *Haynes, supra* at 597 ("While we understand the court's finding that contributing cause to defendant's past behavioral problems was the environment in which he was raised, we believe that the court erred in dismissing the prior criminal conduct and antisocial pattern of living of this defendant as the fault of his role models.").

or no consideration." *Thenghkam, supra.* The trial court did not exercise its judgment, but rather appeared determined to defy the directions of this Court by finding new reasons to reach a predetermined result: a juvenile sentence for Thenghkam. See *Spalding, supra.* This abuse of discretion, alone, would support reversing Thenghkam's sentence and remanding for resentencing.

## VI. DOUBLE JEOPARDY

Citing both the Michigan and the United States Constitutions, Const 1963, art 1, § 15; US Const, Am V, Thenghkam argues that to resentence him now, after he has finished his first sentence as a juvenile, would violate the constitutional prohibition against double jeopardy. If Thenghkam is correct, this Court would be powerless to order resentencing. We conclude, however, that he is not correct.

### A. STANDARD OF REVIEW

Thenghkam's double jeopardy argument is a question of law, which this Court reviews de novo. *People v Echavarria,* 233 Mich App 356, 358; 592 NW2d 737 (1999).

### B. THE CONCEPT OF AN INVALID SENTENCE

Our key task under this issue is to determine if the sentence Thenghkam served was valid. If so, resentencing would subject him to two punishments for the same offense; double jeopardy would prohibit this Court from remanding for resentencing in such a situation. See *North Carolina v Pearce,* 395 US 711, 717;

89 S Ct 2072; 23 L Ed 2d 656 (1969), overruled on other grounds by *Alabama v Smith*, 490 US 794; 109 S Ct 2201; 104 L Ed 2d 865 (1989); *People v Fox (After Remand)*, 232 Mich App 541, 555; 591 NW2d 384 (1998). Otherwise, "[i]t is well-established that an invalid sentence may be set aside and a valid one imposed, subject to the defendant's right to receive credit for any time served on the invalid sentence." *People v Gregorczyk*, 178 Mich App 1, 4; 443 NW2d 816 (1989); see generally *Jones v Thomas*, 491 US 376; 109 S Ct 2522; 105 L Ed 2d 322 (1989); MCR 6.429(A).

### C. AN INVALID SENTENCE.

Case law illustrates a number of different circumstances that make a sentence invalid. For instance, a sentence procured by perpetrating a fraud on the sentencing court by misrepresenting a defendant's criminal history or other information is "invalid." *People v Marcus Harris*, 224 Mich App 597, 598-600; 569 NW2d 525 (1997). Likewise, a sentence is "invalid" "when it is beyond statutory limits, when it is based upon constitutionally impermissible grounds, improper assumptions of guilt, a misconception of law, or when it conforms to local sentencing policy rather than individualized facts." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997), citing *People v Whalen*, 412 Mich 166, 169-170; 312 NW2d 638 (1981); see also *People v Thomas*, 223 Mich App 9, 12; 566 NW2d 13 (1997). More generally, there must be some "legal flaw" in a sentence, *People v Mapp*, 224 Mich App 431, 434; 569 NW2d 523 (1997), or a "tangible legal or procedural error" leading to a sentence, *People v Wybrecht*, 222 Mich App 160, 167; 564 NW2d 903

(1997), in order to consider it "invalid" and justify resentencing. To be clear, this legal error has a neutral posture; a sentence's validity does not rest on whether it favors the defendant's interests over society's interests, or the converse. *Miles, supra* at 98.

### D. THENGHKAM'S SENTENCE.

The language in *Wybrecht, supra* at 167, and *Miles, supra* at 96, most closely describe the problem with the sentence in this case. Here, the trial court misconceived its fact-finding role in making the extremely important decision whether to sentence Thenghkam as an adult or a juvenile. The trial court clearly erred in finding certain facts or failed to find any facts as MCL 769.1(3); MSA 28.1072(3) required. Then, the trial court abused its discretion in the way it failed to balance all the factors in the statute. These errors cannot be separated from the sentence the trial court actually imposed and Thenghkam served. That Thenghkam received and completely served a juvenile sentence, necessarily limited in length by his age at the time of sentencing, can be traced *solely* to these errors. We have no doubt that Thenghkam's juvenile sentence was invalid and, thus, double jeopardy does not bar resentencing in this case. Thenghkam has not alleged, and we do not see, any other obstacles to resentencing under the principles of double jeopardy.

### VII. DUE PROCESS

Thenghkam asserts, without fully arguing, that this Court would violate his right to due process if it vacated his sentence and remanded for resentencing. Const 1963, art 1, § 17;  US Const, Am XIV.

## A. STANDARD OF REVIEW

We review this constitutional question de novo. *People v McIntire*, 232 Mich App 71, 93; 591 NW2d 231 (1998), rev'd on other grounds 461 Mich 147; 599 NW2d 102 (1999).

### B. *GREGORCZYK*

Thenghkam relies on this Court's decision in *Gregorczyk, supra* at 12, to argue that resentencing would violate his due process rights. In that case, the defendant appealed his conviction and five- to twenty-year prison sentence for a narcotics offense. *Id.* at 3. This Court affirmed his conviction, but remanded for resentencing under the statute, which required a minimum ten-year prison term. *Id.* The defendant sought leave to appeal to the Supreme Court. *Id.* While defendant's application for leave to appeal was still pending, the Parole Board granted him an early discharge from his original sentence, effectively excusing him from any further obligation to the state. *Id.* at 3-4. In accordance with this Court's decision to remand the defendant's case for resentencing, the circuit court resentenced him to lifetime probation. *Id.* at 4. Defendant appealed again, and in addition to holding that the second sentence violated the prohibition against double jeopardy because the time the defendant had already served in prison could not be credited against lifetime probation, this Court found a violation of due process on the facts of the case. *Id.* at 8-9, 12; see also *People v Lamb (After Remand)*, 201 Mich App 178, 180-181; 506 NW2d 7 (1993) (limiting *Gregorczyk* to its unique facts). Specifically, this Court in *Gregorczyk, supra* at 12, held that the Parole

Board's decision was an "absolute discharge" from the remainder of the defendant's sentence. Further,

> [t]o impose a new sentence on defendant after being discharged from the first sentence would amount to a revocation or recalling of that discharge. It is axiomatic that the due process guarantee applies with respect to matters relating to sentence and punishment. In this case, with the imposition of the second sentence, defendant's absolute discharge has been summarily revoked without due process.
>
> . . . In this case, due process would require, at a minimum, an inquiry into the facts, circumstances and reasoning surrounding defendant's discharge. There is nothing presented in the record before us sufficient to warrant a recall or revocation of defendant's discharge. [*Id.* at 12.]

Unlike in *Gregorczyk,* the circumstances of Thenghkam's discharge were set in motion by the trial court's erroneous decision to sentence him as a juvenile, not by the intervention of an executive authority. See generally *People v Young (On Remand),* 220 Mich App 420, 430-433; 559 NW2d 670 (1996). Accordingly, the reasoning in *Gregorczyk* does not apply here because Thenghkam did not receive anything equivalent to a commutation, pardon, or reprieve excusing him from any further obligation to the state. See *People v Hill (After Remand),* 202 Mich App 520, 522-523; 509 NW2d 856 (1994). Moreover, the trial court in this case "perpetuated its own error" in the first sentence by resentencing Thenghkam as a juvenile with similarly deficient factfinding and exercise of discretion, knowing that the juvenile authorities' jurisdiction over Thenghkam would simply expire when he reached the age of majority. *Lamb (After Remand), supra* at 181. Therefore, we see no due process violation in this case.

VIII. CONCLUSION AND INSTRUCTIONS

We reverse Thenghkam's sentence as invalid. Thenghkam is now, indisputably, an adult. This leaves us with the difficult task of determining how to approach resentencing Thenghkam on second remand. We are not aware of any programs available to, or suitable for, an adult in the juvenile system. Thus, ordering a juvenile sentence with further conditions, whether probation or detention of some sort, on remand is impracticable. However, we do not wish to limit the trial court's sentencing options merely because this case has been in the courts for a considerable period. In other words, if the trial court makes accurate findings of fact and carries out its duty to weigh those findings properly and still concludes that a juvenile sentence would be appropriate under the statutory factors, it would be unfair to prohibit such a sentence merely because Thenghkam has grown older during the pendency of these appeals.

We believe that the correct and only course of action is to remand this case to the circuit court for a different judge to make findings of fact, and to weigh those findings, under MCL 769.1(3); MSA 28.1072(3) as it appeared when Thenghkam committed the offense. The trial court must address sentencing without relying on the previous judge's findings of fact relevant to sentencing and it must request a new presentence investigator's report. If the trial court determines that a juvenile sentence is appropriate for Thenghkam, then the trial court shall dismiss the case. See *People v Schneider*, 119 Mich App 480, 487; 326 NW2d 416 (1982). If the trial court determines that Thenghkam should receive an adult sentence, the

trial court may take into account Thenghkam's conduct while he was in the custody of the juvenile authorities and any other relevant factors when crafting the new sentence. Furthermore, if the trial court imposes an adult sentence, it shall calculate and apply the sentencing guidelines in force when Thenghkam committed these offenses and credit the sentence with the time he served in the juvenile system. We express no opinion regarding the proper length of an adult sentence, should the trial court find one appropriate here.

Reversed and remanded to a new trial judge. We do not retain jurisdiction.